STATE, EX REL. CITY OF LINCOLN, APPELLEE, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, APPELLANT.

FILED FEBRUARY 25, 1913.   No. 17,678.

1. **Municipal Corporations: STREETS: VACATION.** Under the statute in force in 1892 and 1893, the mayor and council of the city of Lincoln had authority to vacate streets and alleys in said city, and the vacated portions reverted to the owners of the adjacent lots. Comp. St. 1893, ch. 13a, art. I, sec. 67, subd. IV.

2. ———: ———: ———. The ordinance of 1892 *held* to vacate that

portion of P street taken and occupied by the defendant company as its station and switching grounds, and, the company then being the owner of the adjacent lots, the vacated portion became the property of the company.

3. ———: RAILROADS: VIADUCTS. The city of Lincoln cannot compel a railroad company to construct a viaduct over its property occupied by its station and switching tracks where there is no public way or street.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE. *Reversed and dismissed.*

*M. A. Low, P. E. Walker, E. P. Holmes* and *G. L. De Lacy,* for appellant.

*Foster & McClenahan* and *Burr, Greene & Greene, contra.*

SEDGWICK, J.

In March, 1907, the mayor and council of the city of Lincoln duly enacted and approved an ordinance decreeing the necessity of a viaduct and approaches thereto "over and across the tracks of certain railway companies in and over P street of the city of Lincoln," and requiring the defendant company to construct a viaduct over and across its railway tracks at P street. At the general city election of that year the plan was approved and the mayor and council empowered to require its construction. In August of the following year the mayor and council duly passed and approved an ordinance for that purpose. The company having neglected to construct the viaduct, this action was brought in the district court for Lancaster county to obtain a peremptory writ of mandamus to compel it to do so. Upon trial in that court the issues were found in favor of the city, a peremptory writ ordered as prayed, and the defendant company has appealed.

There is no question raised as to the regularity of the preliminary proceedings, but it is contended by the defendant that there is no public street over its right of way at the place in question, and that therefore the city of

Lincoln is without authority to compel the construction of the viaduct. This question depends upon the construction and meaning of the ordinance known as ordinance No. 218, also known as No. 1641, enacted in July, 1892, entitled: "An ordinance providing for the passage of the railway of the Chicago, Rock Island & Pacific Railway, Company across and through the streets and alleys of the city of Lincoln, in the county of Lancaster, and state of Nebraska, and vacating portions of certain streets and alleys in said city for the purpose of giving right of way and other privileges in said city to said railway company." The seventh section of this ordinance is as follows: "That all of that part of P street in said city lying south of lots 9, 10, 11 and 12, in block 13, Kinney's O Street addition to said city, be, and the same is hereby, vacated." That part of P street described in this section was about 200 feet in length, and at that time the defendant company owned the lots abutting thereon on each side of the street. Under the statute then in force, if a street of the city was vacated, the territory so vacated reverted to the owners of the adjacent lots.

It is contended by the city that the mayor and council were without authority to vacate the streets of the city, and that the proper construction of the ordinance is that it grants a right of way to the company over the streets of the city, and does not vacate the streets for any other purpose. Upon the first contention it is sufficient to say that the statute then in force expressly authorized the mayor and council "to open, widen, or otherwise improve, vacate, care for, control, name, and rename any street, avenue, alley, or lane, parks, and squares, within the limits of the city." Comp. St. 1893, ch. 13a, art. I, sec. 67, subd. IV. Some authorities are cited by the relator holding that the city, under such a statute, cannot vacate a public street solely for the purpose of donating it to some individual or corporation, but those authorities are not applicable for two reasons: First, because in those cases the streets when vacated remained the property of the

city, and, of course, could not be disposed of as a pure gift or donation; second, because in this case the ordinance was somewhat in the nature of a contract, and was enacted for the public benefit to procure the defendant company to construct its line through the city for the convenience of the citizens and traveling public generally, as well as for the accommodation of the company.

The twelfth section of the ordinance provided that the company and its successors and assigns are "given and granted the right and privilege of occupying so much of said streets and alleys, vacated by this ordinance, as said railway company, its successors and assigns, may at any time desire for its railroad, switches, side-tracks, depots and other railroad purposes." It is contended that this shows that the intention was merely to create a right of way over the streets vacated, and not to vacate the streets named for other purposes. It will be noticed that the title of the act specifies that it is the purpose to grant a right of way through the streets and alleys of the city and to vacate portions of said streets and alleys, not only for the purpose of giving a right of way, but also to give "other privileges" in said city. The first section of the ordinance granted a right of way "over, through, along and across (naming 12 streets), together with the right of way upon, along and across all alleys crossed or intersected by said located line." This section does not mention the vacating of any streets, and was sufficient for the purpose of granting a right of way, if that was all that was intended. O street was then, as it is now, the main thoroughfare of the city, and section 1 also provided that no more than two tracks, including the main line, should be constructed over O street. The ordinance also provided that the company shall not construct more than three tracks, including the main line, across L, M, N and Monroe avenue, which lie immediately south of P street, and not to exceed four tracks, including its main line, across Q and R streets, which lie immediately north, and there is no limitation of the number of tracks to be placed

across P street. It was provided that the company shall maintain an arc light of 2,000 candle power on M, N and O, three streets immediately south of P street, and on Q, R and Vine, three streets immediately north, but made no provision for maintaining a light at P street. The ordinance also required the company to pave and keep in repair as a street a strip of ground immediately west of its depot, 25 feet wide, "so as to connect with O street and with P street in said city," thus enabling the traffic on P street to pass over on O street, as it was prevented from crossing on P street. This provision the company has fully complied with. In due time after the enactment of this ordinance the company took possession of that part of P street that was vacated by the seventh section of the ordinance, and constructed its switch tracks and other improvements thereon, erected its station building immediately adjoining it, and, in fact, extending slightly upon the vacated portion of the street. The evidence shows that some foot-passengers have crossed over this vacated strip, and that teams and conveyances have been known to cross it, but the tracks "have a $4\frac{1}{2}$-inch drop on its rail," and they are not planked or otherwise prepared for crossing. There has been no crossing there by people or conveyances in any different manner than they might cross or drive over the railroad right of way at any and all places. The property has been in the exclusive possession and control of the railway company as much as any property devoted to a public use could be, and this has been continued now for much more than 10 years.

Other sections of the ordinance vacate that part of Twentieth street lying between P and O streets which the company was required to pave, as above stated, and also a small portion of two alleys through which the right of way extended; and it is contended that the provision, that the company should have the right and privilege of occupying these vacated parts, indicates that the intention was to make a qualified vacation for right of way only. The railway company did not own the property abutting

on the vacated portions of these two alleys, and it may have been thought necessary, in order to secure the right of way then as against the owners of the abutting property, to make special provision therefor in the ordinance. Whether the mayor and council had power to prevent the vacated portions of these alleys reverting to the owners of the abutting property is not now material in this inquiry. The company has occupied them under this claim of right for much more than 10 years, and it is too late now to question the right of the company in its depot and switching grounds because of any doubt as to the original right to occupy the vacated alleys as against the owners of the abutting property. Under these conditions, it is impossible to conclude that the vacation of the part of P street in question by the seventh section of the ordinance was intended merely as a grant of right of way. This vacated portion of P street became the property of the defendant company as the owner of the abutting lots. This ownership and full control of the property has been continually recognized by the city authorities and the company has held and exclusively occupied this territory for much more than 10 years. The power given to the city by the statute to compel the construction of a viaduct requires that it must be over a railway track on or across a "public way," and must be a "viaduct on or along such street, under or over such track." Ann. St. 1911, sec. 8031. As there was no public way or street crossed by the railway tracks at the proposed place, the city was without authority to compel the construction of a viaduct.

We do not at this time determine the right and power of the city to now open the street over these station grounds by condemnation proceedings, as that question is not presented by the record.

The judgment of the district court is reversed and the action dismissed.

REVERSED AND DISMISSED.

HAMER, J., not sitting

FAWCETT, J., dissenting.

I am unable to concur in the construction by my associates of ordinance No. 218, published in the Revised Ordinances of the City of Lincoln in 1895 as No. 1641. At the time that ordinance was passed and the streets entered upon by the respondent, I do not think either the city or the railway company regarded the ordinance as an absolute and unlimited vacation, for its full width, of any part of P street. To my mind, the intent and purpose of the ordinance was simply to give the company a right of way across the streets and alleys of the city, named in the ordinance, together with the right to construct certain side-tracks across but not along P street. That it was not the intention of the city to give the company the right to erect its depot building upon P street, or any other street, is shown by section 4 of the ordinance, which provides: "That said railway company shall, within one year, construct a substantial passenger depot building of brick or stone, or brick and stone, at or near the northwest corner of the intersection of O and Twentieth streets and north of O street." In order to comply with this provision of the ordinance, the company would be compelled to build its depot upon its own ground lying north of O, west of Twentieth and south of P streets. This construction is corroborated by the fact that the company did, within one year thereafter, construct its depot building as I have indicated. No part of the foundation or walls of the depot extends north of block 28, or upon P street. The only encroachment upon P street by the depot is by a projection of the cornice, upon the north end of the baggage room, a few inches over the south line of P street. That the ordinance was intended merely as a grant of a right of way and not as an absolute vacation of P street is shown by the ordinance itself. The title of the ordinance reads: "An ordinance providing for the passage of the railway of the Chicago, Rock Island & Pacific Railway Company across and through the streets and alleys of the

city of Lincoln, in the county of Lancaster, and state of Nebraska, and vacating portions of certain streets and alleys in said city for the purpose of giving right of way and other privileges in said city to said railway company." The whole reference in this title to the question of vacation is in the last clause, "and vacating portions of certain streets and alleys in said city for the purpose of giving right of way and other privileges in said city to said railway company." It will be observed that in this clause of the title there is not even a comma separating the words, "and vacating portions of certain streets and alleys in said city," from the words, "for the purpose of giving right of way and other privileges in said city to said railway company." It seems to me that words could not be used to indicate more plainly that the vacating of certain streets and alleys was to be "for the purpose," and for the purpose only, "of giving right of way," etc. The language of the ordinance itself is in harmony with the title, and its interpretation is as unmistakable.

Section 7 provides: "That all that part of P street in said city lying south of lots 9, 10, 11 and 12, in block 13, in Kinney's O street addition to said city, be and the same is hereby vacated." If the construction placed upon the ordinance by the majority opinion is correct, then that portion of P street, lying south of those four lots in block 13, and north of lots 1, 2, 3 and 4 in block 28, became the absolute property of the company, by reason of the fact that it was then the owner of the four lots in block 13 and the four in block 28, above enumerated, and P street, from the west line of lot 9 in block 13, and lot 4 in block 28, east to Twentieth street, no longer existed. If the city council considered that it was so vacating that portion of P street, wiping it off the map of the city, so to speak, and giving it to the railway company, what did either the city or company expect that the city and the public generally would gain by the provision in section 8 of the ordinance, which provided that the company "shall dedicate, pave and keep in repair, as a street, a strip of

ground west of its said depot 25 feet wide, and through said block 28, in Kinney's O street addition to Lincoln, Nebraska, so as to connect with O street and with P street in said city?" The strip of ground specified, lying west of the company's depot, would run from O street northerly, and would strike the point where P street had formerly been some distance east of the west line of lot 9, in block 13, and lot 4, in block 28, so that, while it would connect with O street on the south, it would not connect with P street on the north, because, if the majority opinion be right, there was then no P street at the point where this 25-foot strip would intersect what formerly had been P street. In other words, the northern termini of this 25-foot strip would be upon the railway company's private land, which it received under the ordinance. When the right of a city to the control of its streets is sought to be taken from it by construction, such construction should rest upon more reasonable ground than this.

Again, it was admitted by the respondent at the trial "that, before the construction of the railroad, the city built a water main on P street at the place in controversy in this lawsuit, and has since said time maintained it;" yet the ordinance nowhere reserves to the city the right to go upon this part of P street for the purpose of making repairs that may at any time be needed upon its water main. If the city desired to go upon that ground for the purpose of renewing or repairing this water main, it would have to first obtain the consent of the railway company, or proceed as a trespasser. I do not think either the city or company then considered, or that the company should now be permitted to contend for any such construction of this ordinance.

Again, section 12 of the ordinance provides: "That said Chicago, Rock Island & Pacific Railway Company, its successors and assigns, be and the said railway company, its successors and assigns, are hereby given and granted the right and privilege of occupying so much of said streets and alleys, vacated by this ordinance, as said railway

company, its successors and assigns, may at any time
desire for its railroad, switches, side-tracks, depots, and
other railroad purposes." What was intended by this sec-
tion? Is it to be construed as a mere jumble of words,
without purpose or meaning of any kind? Certainly not.
The company is "given and granted the right and privi-
lege of occupying"—what? The other streets and alleys
over which it might cross? No. It was given and granted
the right and privilege of occupying "so much of said
streets and alleys, vacated by this ordinance." If the
ordinance absolutely vacated those streets and alleys, the
land became the property of the company, and it did not
need any grant from the city of the right and privilege of
using it for any purpose it saw fit. This provision was in-
serted in the ordinance for the reason that the city and
the company both knew that it was not the intention to
absolutely vacate these streets and alleys, but to simply
give a right of way over and across them; and the grant
given by this section was to permit the company to not
only cross the streets and alleys, designated as vacated,
but at any time, when desired for its railroad switches,
side-tracks, depots and other railroad purposes, to occupy
so much of said streets and alleys as would be necessary
for those purposes. This is undoubtedly what is meant
by the words "and other privileges" found in the title of
the ordinance, following the words, "for the purpose of
giving right of way." A point is attempted, in the ma-
jority opinion, to be based upon these words; but I do not
think it requires argument to support the statement that
they cannot, by construction, be made to grant any greater
rights than those given by the specific words of grant
with which they are connected. The words "other privi-
leges" cannot be construed to mean more than "similar"
privileges. Privileges of like character. The meaning of
the language is as if the clause had been written, "and
vacating portions of certain streets and alleys in said
city for the purpose of giving right of way and similar
privileges in said city to said railway company."

To my mind, section 13 of the ordinance is also significant. It reads: "By the acceptance of the rights and privileges hereby granted, the said railway company shall be taken to agree, and does hereby agree, to save and keep said city of Lincoln harmless from the payment of any damages, growing out of the rights hereby conferred, in favor of any person whomsoever." The only references in this section are to rights and privileges granted, and not to lands donated, by vacation or otherwise. It is another circumstance in the chain of circumstances, tending to show that both the city and the company considered and fully understood that all the company was obtaining was certain rights and privileges over and across the streets and alleys of the city.

It is contended by the city that, to hold that the ordinance absolutely vacated that portion of P street in controversy, and thereby, by reason of the fact that the company owned the lots on either side abutting thereon, transferred to the company the title and absolute ownership of that portion of the street so vacated, is contrary to, prohibited by, and in conflict with the fourteenth amendment to the constitution of the United States, in that it constituted the taking of property without compensation; that the ordinance was passed without a vote of the people, or an opportunity on the part of any one to be heard in any tribunal as to compensation. It is stipulated that O and P streets and the various lettered streets running east and west from corporation line to corporation line "were duly laid out and dedicated for public use as streets, and the fee title thereto conveyed to the city of Lincoln." Relator contends that, such being the case, if the street was vacated as claimed, the title to the ground did not pass to the abutting lot-owners, but remained the property of the city, and became a part of its real estate, which it could not donate to the company, nor even sell without a vote of the electors of the city, in accordance with section 9, article II, chapter 13a, Compiled Statutes 1891, which provides that the mayor and

council "shall not have power to sell any real estate of the city unless authorized so to do by a vote of the majority of the electors of such city at a special election therefor." This question is squarely decided adversely to the city in the second paragraph of the syllabus and in that part of the majority opinion upon which the syllabus is predicated.

P street is one of the main public streets of the city of Lincoln, extending from the city limits on the west to the city limits on the east. It is well built up on both sides of the street for over a mile west of the point in controversy. The post office, the Lincoln Hotel, the Savoy Hotel, the Commercial Club, the Elks Club, the Young Men's Christian Association, and many large business buildings front upon it. It is also built up on both sides with valuable residences, solidly for many blocks, and partially so for many more blocks east of the point in controversy. By a vote of the electors it has been decided that a viaduct should be built across the tracks of the railway company where they cross that street. The necessity for such a viaduct is not questioned. O street (the next street south) is frequently quite congested. Numerous street car lines run on O street. It is the main street leading to the city cemetery. The travel over it by automobiles, carriages and wagons is more or less continuous, and the crossing at its intersection with respondent's track is necessarily more or less attended with danger, notwithstanding the precautionary steps taken by the company to prevent accidents. With a viaduct across the tracks on P street the congestion on O street would be relieved. Automobiles and other vehicles could pass over the tracks without danger or delay. The people living on P street, east of the tracks, would have the use of the street to and from the post office and business center of the city, and the thousands of citizens living west of Twentieth street would have a safe and never-obstructed route to the city cemetery. The proposed viaduct would not prevent or in the least obstruct the company in the free use of the

street for any of the purposes specified in the ordinance. On the contrary, it would give the company such use freed from the dangers incident to the use now being made of it by the public on foot and at times in vehicles of various kinds. In the closing lines of the opinion there is the suggestion of a possible right on the part of the city to regain control of P street by condemnation proceedings. I am unable to see the justice in requiring the city to resort to condemnation proceedings, and to pay to the company, in such proceedings, a large sum of money, to regain that for which the company paid nothing, and which it is exceedingly doubtful if it ever obtained. There being, to say the least, grave doubt upon that point, such doubt should, under the circumstances shown in this case, be resolved in favor of the city. It is idle to say that the city received any consideration for the conveyance of its fee title to or the surrender of its control over a solid section of one of its principal streets. The right given the company to run its main-line track through the center of the capital city of the state, and to use streets and alleys in the heart of the city for side-tracks and switches, was and is worth to the company many times as much as any benefit it thereby conferred upon the city. The only way it will suffer from building the viaduct will be in the cost thereof. Equity, and its contract with the city, both require it to bear that cost. The district court so found, and I think it should require a much clearer case than the one before us to warrant us in reversing that judgment.

*Tonkawa Milling Co. v. Town of Tonkawa,* 15 Okla. 672, is as like the case at bar as "two peas in a pod." The title to the ordinance in that case is: "An ordinance granting a right of way to the Blackwell and Southern Railway Company through the town of Tonkawa, Kay county, Oklahoma territory, and, for the purpose of such right of way, vacating certain streets, avenues and alleys in said town of Tonkawa." The only difference in that title and the one under consideration here is the words of vacation and of the purpose therefor are transposed. In

the consideration of that case, on page 678, the court say: "By the express terms and provisions of the ordinance it is clear that nothing more was intended or attempted by the town than to grant to the railway company a right of way over and across the streets and alleys named, and the right to the railway company to use and occupy the same for the purposes mentioned." I fully concur in that construction of the ordinance. I do not see how any other construction can reasonably be placed upon the language used. No case has been cited, either in the majority opinion or in the brief of counsel, which would sustain any other construction.

REESE, C. J., concurs in this dissent.