FLORA BULLOCK, ET AL., APPELLEES, v. CITY OF LINCOLN ET AL., APPELLANTS.

FILED OCTOBER 21, 1927.   No. 25590.

C. Petrus Peterson, Charles R. Wilke and R. A. Boehmer, for appellants.

*Mann & Whitten, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

ROSE, J.

This is a suit in equity for an injunction preventing the city of Lincoln from collecting special assessments to pay a portion of the cost of opening Thirty-fifth street northward 200 feet through the right of way of the Missouri Pacific railroad to the south end of Idylwild drive, where the railroad track ran east and west on an embankment 17 feet higher than the surface of those streets. The improvements consisted of an opening north and south through the railroad embankment, an abutment at each side of the opening, a railroad bridge or viaduct over the extension of Thirty-fifth street and the paving thereof and the laying of sidewalks through the railroad right of way. Flora Bullock and Edna D. Bullock, plaintiffs, own lots in Meadow Lark addition within the improvement district and these were assessed for special benefits. Plaintiffs seek relief also for other lot owners similarly situated.

The petition in equity contains pleas to the effect that real estate of plaintiffs was illegally assessed for a railroad viaduct which the railroad company should have been required to construct at its own expense and that the city was without power to impose any part of that burden on plaintiffs by means of assessments for special benefits. An injunction was sought on the ground that the assessments were void.

The suit was defended on the theory that the city proceeded regularly under its charter, which contains provisions for the creation of improvement districts, for the opening of streets and for the assessment of lots especially benefited. The facts necessary to a determination of the controversy were well pleaded on both sides.

Upon a trial of the issues the district court made findings in favor of plaintiffs and granted the prayer of their petition. The city appealed.

The power of the city to assess the property of plaintiffs for special benefits arising from the improvements is the question presented. The solution depends on the proceedings of the city and the provisions of the city charter. Conditions calling for the improvements were as follows: Thirty-fifth street, running north, terminated at right angles with the railroad right of way in Peck's Grove, a residential district. Idylwild drive, running south, terminated at the north side of the railroad right of way, opposite the north end of Thirty-fifth street, in Woods Brothers addition, also a residential district. Between the north end of Thirty-fifth street and the south end of Idylwild drive, a distance of 200 feet, were the railroad right of way, the railroad embankment 17 feet high, and the railroad track. A better and safer way to and from different parts of the city was obvious. The extension of Thirty-fifth street to Idylwild drive required a viaduct.

The power of the city to condemn or purchase the necessary land and to open the street through the railroad right of way and to require the construction of a bridge or viaduct for an overhead railroad track is not open to serious controversy, but authority to assess the lots of plaintiffs for special benefits is a different question. The railroad company owned the fee to the strip of land 200 feet wide between Thirty-fifth street and Idylwild drive.

In outline the city proceeded as follows: August 16, 1920, creation of improvement district, the cost of the improvements to be assessed against benefited realty therein; January 31, 1921, improvements ordered; June 23, 1922, agreement by the city to purchase and by the railroad company to sell the fee to a strip of railroad land 66 feet wide and 200 feet long between Peck's Grove and Woods Brothers addition, including the land for the extension of Thirty-fifth street, subject to an easement for railroad purposes, the city to pay in part consideration $10,000 to the railroad company and the latter to make at its own expense the contemplated improvements without liability for assessments for special benefits; August 28, 1922, delivery and accept-

ance of deed containing the terms of purchase and sale; September 29, 1924, improvements costing the railroad company over $23,000 accepted by the city; January 19, 1925, real estate in the improvement district assessed for special benefits to the extent of $5,000.

Were the assessments for special benefits valid? **The** city charter provides:

"The city council shall have power, by ordinance, to create public improvement districts for the opening, widening, or enlarging of any street, alley, boulevard, or public way or for the establishing or enlarging of any park or parkway within the city. Such special improvement district having been created, the city council may acquire, by purchase or by condemnation proceedings, the necessary lands, lots or grounds to carry out the purposes of the district. The cost thereof may be, in whole or in part, assessed proportionate to benefits, on the property specially benefited." City Charter, art. VIII, sec. 4½.

Another section of the charter relating to public improvements and applicable to viaducts contains, among other provisions, the following:

"The city council shall have power, by ordinance, to require any company owning or operating any railroad track on or across any public way to erect, construct, reconstruct, complete, and keep in repair any viaduct on or along such public way, under or over such track including viaduct approaches, as may be declared necessary for public safety. * * * Whenever the construction of any viaduct, including its approaches, over any street or under any track, or the elevation of any railroad track within the city limits, be by ordinance declared necessary for public safety and protection, the city council shall provide for appraising, assessing and determining the damages that may be caused to any property by the construction thereof. * * * It shall be the duty of any railroad company or companies on being required as herein provided to construct, reconstruct, erect or repair any viaduct or to elevate any railroad track, to proceed with the work within the time and in the manner

required by the city council, and it shall be a misdemeanor for any railroad company to fail, neglect, or refuse to perform such duty. * * * The city council shall have power whenever any railroad company shall fail, neglect, or refuse to erect, construct, reconstruct, or repair any viaduct or viaducts, or to elevate any railroad track, after being required so to do as herein provided, to proceed with such work by contract or in such manner as may be provided by ordinance and assess the cost thereof against the property of the railroad company or companies required to do the same." City Charter, art. VIII, sec. 2.

The city relies on provisions relating to the opening of streets to justify the municipal proceedings and the assessments, while plaintiffs, to sustain the injunction, invoke that part of the charter authorizing the city to impose on railroad companies the burden of constructing at their own expense viaducts at street crossings.

The provisions relating to viaducts are special in character and are not controlled by the section authorizing the opening of streets. A general plan to unite in a single scheme the opening of a street and the constructing of a viaduct above it does not relieve the railroad company from liability for expenses of the latter, if imposed by a proper exercise of police power, nor transfer that burden to property owners in the improvement district. The overhead structure, 17 feet high, resting on abutments 66 feet apart is a viaduct within the meaning of the city charter. It answers every purpose of the municipal law relating to the construction and the maintenance of viaducts. The evidence will admit of no other conclusion. At the intersection a better and safer way to and from different parts of the city was necessary. Public safety required the viaduct. It is argued, nevertheless, that the railroad company had the senior way over the land needed for the street and that it could not be compelled to construct the viaduct at its own expense because Thirty-fifth street had not been opened through its right of way, citing *State v. Chicago, R. I. & P. R. Co.*, 93 Neb. 263, wherein it was held:

"The city of Lincoln cannot compel a railroad company to construct a viaduct over its property occupied by its station and switching tracks where there is no public way or street."

The decision in the case cited was qualified as follows:
"We do not at this time determine the right and power of the city to now open the street over these station grounds by condemnation proceedings, as that question is not presented by the record." *State v. Chicago, R. I. & P. R. Co.,* 93 Neb. 263.

That decision, therefore, left open the question now under consideration.

The city of Lincoln by means of special benefit assessments on lots in the improvement district could not shift from the railroad company to the lot owners any part of the cost of the viaduct, since the city charter required the railroad company, if the city proceeded lawfully and regularly, to construct the viaduct at its own expense. If the scheme of, and the course pursued by, the city were illegal, authority to make the assessments did not exist. In the present instance the city, before the viaduct was constructed, created the improvement district, purchased land for the purpose of extending Thirty-fifth street and ordered the opening thereof through the railroad right of way. The nature of the overhead structure as a viaduct was not changed by proceedings and contracts calling it a "bridge" or "a part of an improvement for the opening of a street." The deed from the railroad company to the city contained a stipulation that part of the consideration for the payment of $10,000 was the construction of abutments and a bridge for the railroad track over the extension of Thirty-fifth street. The evidence shows that the property of plaintiffs was assessed to pay a portion of the cost of the viaduct, a burden not within the power of the city to impose. The injunction, therefore, was properly allowed.

AFFIRMED.